UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PAUL A. GARGANO, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * Civil Action No. 09-11938-JLT |
| | * |
| CAYMAN NATIONAL CORP., | * |
| CAYMAN NATIONAL SECURITIES, LTD., | * |
| and CAYMAN NATIONAL BANK, | * |
| | * |
| Defendants. | * |
| | * |

MEMORANDUM

June 2, 2010

TAURO, J.

I.  Introduction

This action arises out of the default of an annuity, which Plaintiff purchased from a Trinidadian insurance company by means of Defendants brokerage services in the Cayman Islands. Presently at issue is Defendants' Motion to Dismiss for Lack of Personal Jurisdiction [#8]. For the following reasons, Defendants' Motion to Dismiss for Lack of Personal Jurisdiction [#8] is ALLOWED.

II.  Background

Defendants Cayman National Corporation ("CNC"), Cayman National Securities, Ltd. ("CNS"), and Cayman National Bank ("CNB") are financial services entities, licensed and regulated by the Cayman Islands.[1] CNB provides full service banking facilities to domestic and

---

[1]Aff. of Ian Whan Tong, ¶ 6.

international clients in major currencies. CNS is an investment services brokerage, and acts as Plaintiff's broker in the Cayman Islands. And CNC is the parent company for CNB and CNS.[2] All three companies are incorporated under the laws of the Cayman Islands and operate subject to the provisions of the Companies Law of the Cayman Islands.[3]

Each of the Defendants is located in the Cayman Islands and all three intentionally minimize their business contacts with the United States to the greatest degree possible. For example, none of them conduct business from or within the United States, advertise in the United States, or solicit customers in the United States.[4] The Defendants neither have offices outside of the Cayman Islands, nor officers, managers, or employees in the United States.[5] CNB has no branches or ATMs in the United States.[6] And the Defendants are not registered to do business in the United States, have never held meetings in the United States, have never filed or been under an obligation to file tax returns in the United States, and have never owned real property in the United States.[7]

Plaintiff is a Massachusetts resident, but he also holds a Cayman Islands passport, which lists his nationality as "B.O.T.C. Cayman Islands."[8] B.O.T.C. stands for British Overseas

---

[2] Id. ¶ 4.

[3] Id. ¶¶ 7, 10, 12.

[4] Id.

[5] Id. ¶¶ 7-14.

[6] Id. ¶ 13.

[7] Id. ¶¶ 7-14.

[8] Aff. of Paul Gargano, 1.; Tong Aff. ¶ 24.

Territory Citizen and is a status equivalent to Cayman Islands citizenship.[9]  Plaintiff has owned property in the Cayman Islands since at least the mid-1980s.[10] His current house was built in 2003 and is located at 416 Water Cay Road, Cayman Kai, Cayman Islands.[11]  Plaintiff spends a significant amount of time every year in the Cayman Islands.[12]  In fact, Plaintiff claims to be a Cayman Islands resident on his law firm's website, which states that Plaintiff is "affiliated as a consultant with the immigration firm of Anglen-Lewis in the Cayman Islands of which he has been a resident for 26 years."[13]

Plaintiff and his wife have two joint checking accounts with CNB,[14] from which they draw money to pay for Caymanian goods and services during the portion of the year that they reside in the Cayman Islands.[15]  CNB did not solicit Plaintiff's business in either the Cayman Islands or the United States. Rather, Plaintiff transferred his accounts to CNB because his prior Cayman bank was transferring its business to the Bahamas.[16]

Plaintiff applied for the first checking account in September 2004. The address listed on that

---

[9] Tong Aff. ¶ 24.

[10] Gargano Aff., 1.

[11] Aff. of Scott McConchie, ¶ 6, Ex. D.

[12] McConchie Aff., ¶¶ 6-7; Tong Aff. ¶ 15.

[13] McConchie Aff., ¶ 8.

[14] Tong Aff., ¶ 26.

[15] Gargano Aff., 1.

[16] Tong Aff., ¶ 25.  Plaintiff did not and does not have a discretionary or trust account with CNS. He was solely responsible for selecting investments he wanted and CNS acted as the broker.  Tong Aff., ¶ 16; Affidavit of Naiem Qadir, ¶ 4.

application is "416 Water Cay Road, Cayman Kai; Cayman Islands; Grand Cayman."[17] The second application, completed in March 2005, similarly lists Plaintiff's Cayman address.[18] Both applications were accepted in the Cayman Islands,[19] and Plaintiff's account statements were thereafter ordinarily mailed via post to Plaintiff at his Cayman Islands mailing address. On occasion, the statements may have been mailed or faxed to Plaintiff in Massachusetts if he so requested.[20]

Plaintiff and his wife also opened up a joint brokerage account with CNS in July 2004.[21] Like CNB, CNS never solicited Plaintiff's business in either the Cayman Islands or the United States.[22] When opening up his account, Plaintiff completed a "New Account Form" and a "Customer Trading Agreement."[23] Both of these forms were accepted by CNS in the Cayman Islands.[24] As he had on his CNB account application, Plaintiff listed as his address "416 Water Cay Road, Cayman Kai, Cayman Islands,"[25] and provided Cayman residential phone and fax numbers. On March 5, 2007, Plaintiff executed an updated Trading Agreement, which also was accepted in the Cayman Islands.[26] The Trading Agreement provides that it shall be governed by Cayman law and notes that the Parties have

---

[17]Tong Aff., ¶ 26, Ex. I.

[18]Tong Aff., ¶ 26, Ex. J.

[19]Id.

[20]Id. ¶ 28, Ex. L.

[21]Tong Aff., ¶ 16.

[22]Id., ¶ 25.

[23]Id., ¶ 18, Ex. C.

[24]Id.

[25]Id. ¶ 19.

[26]Tong Aff., WT Aff., ¶ 20, Ex. D.

agreed to Cayman jurisdiction.[27]

Plaintiff first wired money into his CNS account in June 2005.[28] Around that time, Plaintiff met with Naiem Qadir, who was Head of Investment Services at CNS in Grand Cayman, and who took on the role of Plaintiff's financial advisor.[29] The relatively few face-to-face meetings Plaintiff had with Qadir, or any other agent of Defendants, occurred in the Cayman Islands.[30] Qadir believes, and Plaintiff does not dispute, that most, if not all, of the telephone conversations he had with the Plaintiff occurred while Plaintiff was physically in the Cayman Islands.[31] And most written communications between Defendants and Plaintiff occurred via email.[32] For example, statements bearing Plaintiff's Cayman address were emailed monthly to him.[33]

In or around early April 2008, Qadir met with Plaintiff at CNS's offices in Grand Cayman,[34] at which time Plaintiff told Qadir that he had $1 million he wanted to invest in a conservative yet high yield investment. Qadir suggested that an annuity offered by a Trinidadian insurance company, called Colonial Life Insurance Company ("CLICO"), might be appropriate.[35] Qadir subsequently emailed Plaintiff marketing material regarding the annuity, as well as a spreadsheet prepared by CNS that

---

[27] Id. ¶ 21.

[28] Qadir Aff., ¶ 3.

[29] Gargano Aff., 1; Qadir Aff., ¶ 3.

[30] Qadir Aff., ¶ 8.

[31] Id.

[32] Id., ¶ 7.

[33] See, e.g., Tong Aff., ¶ 17, Exs. A and B.

[34] Qadir Aff., ¶ 12.

[35] Id.

showed projected returns for an investment of $1 million in a CLICO annuity.[36]

Ultimately, Plaintiff decided to purchase the CLICO annuity through CNS's brokerage services.[37] CNS purchased for Plaintiff a CLICO Executive Flexible Premium Annuity for $1 million. On April 21, 2008, CLICO issued the certificate at a guaranteed interest rate of 7.5% per annum and with a maturity date of April 20, 2009.[38] Pursuant to the annuity, CLICO paid interest to Plaintiff every month up through January 2009.[39] On January 30, 2009, however, CLICO's parent company, Colonial Life Financial, announced that the Trinidadian government and Central Bank were instituting a bailout measure to address liquidity problems with CLICO and related companies. CLICO subsequently defaulted on the annuity it had issued to Plaintiff.[40]

Plaintiff now alleges eight counts against each defendant based on the services they provided to him in relation to his purchase of the defunct CLICO annuity: (1) violation of the Securities and Exchange Act of 1934 and Securities Exchange Commission Rule 10b-5; (2) Nondisclosure; (3) Breach of Fiduciary Duty; (4) Fraud in the Inducement; (5) Fraudulent Misrepresentation; (6) Negligent Misrepresentation; (7) violation of Mass. Gen. Laws c. 93A; and (8) Breach of Contract. Notably, the Complaint makes no reference at all to Massachusetts or the United States, other than it being the place where Plaintiff resides.

III.   Discussion

---

[36] Qadir Aff., ¶ 12, Ex. 2; Gargano Aff., 2.

[37] Qadir Aff., ¶¶ 13-15; Tong Aff., ¶¶ 29-30.

[38] Tong Aff., ¶¶ 30, 35.

[39] Gargano Aff., 2; Tong Aff., ¶ 31.

[40] Tong Aff., ¶ 31.

A.     Standard of Review[41]

On a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), Plaintiff ultimately bears the burden of persuading the court that jurisdiction exists.[42]  "Plaintiffs may not rely on unsupported allegations in their pleadings, but are obliged to adduce evidence of specific facts,"[43] sufficient to justify the exercise of jurisdiction over the Defendants.  In turn, the court will accept those "specific facts affirmatively alleged by the plaintiffs as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim."[44]  The court will also "add to the mix facts put forward by the defendants, to the extent that they are uncontradicted."[45]

B.     Personal Jurisdiction as to Plaintiff's State Law Claims

A federal court, sitting in diversity, may only exercise jurisdiction over a defendant with respect to whom both the forum's long arm statute and the Constitution are satisfied. This court "may sidestep the statutory inquiry and proceed directly to the constitutional analysis, however,

---

[41] At the outset, it bears noting that Plaintiff makes lengthy arguments as to why Defendants do not enjoy sovereign immunity, which would prevent this court from exercising jurisdiction over them.  It is not entirely clear to this court how such arguments are relevant to the underlying facts presented here.  Nonetheless, this court need not address the issue of sovereign immunity because Defendants concede that they are not agencies or instrumentalities of a foreign state, but rather independent corporate entities.

[42] See Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 675 (1st Cir. 1992) (internal citations omitted).

[43] Platten v. HG Berm. Exempted Ltd., 437 F.3d 118, 134 (1st Cir. 2006) (internal quotations omitted).

[44] Id. (quoting Mass. Sch. of Law, 142 F.2d at 34).

[45] Id. (quoting Mass Sch. of Law, 142 F.2d at 34).

because the Supreme Judicial Court has interpreted the state's long-arm statute 'as an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States.'"[46]

The relevant constitutional inquiry for this court is whether the Due Process Clause allows Massachusetts to exercise personal jurisdiction over Defendants. Specifically, the Constitution requires that the Defendants have sufficient minimum contacts with Massachusetts "such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[47] Where, as here, Plaintiff has not alleged that the defendants engaged in a course of continuous and systematic activity in the forum state that would allow the court to exercise general jurisdiction over them, the tenability of Plaintiff's claims depends on the presence or absence of specific jurisdiction.[48]

Specific jurisdiction exists only where the "cause of action arises directly out of, or relates to, the defendants' forum-based contacts."[49] This, in turn, is a distinctly fact-based inquiry that asks whether the defendant's in-state conduct forms an "'important, or material element of proof' in the plaintiff's case."[50] The First Circuit has further explicated the issue by formulating a

---

[46]Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 52 (1st Cir. 2002) (quoting Automatic Sprinkler Corp. of Am. v. Seneca Foods Corp., 361 Mass. 441, 443 (1972)).

[47]Platten, 437 F.3d at 135 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

[48]See United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088 (1st Cir. 1992).

[49]Id. (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-16 (1984)).

[50]Id. at 1089 (quoting Marino v. Hyatt Corp., 793 F.2d 427, 430 (1st Cir. 1986)).

tripartite test for the ascertainment of specific jurisdiction. Pursuant to this test, Plaintiff must adduce evidence demonstrating that (1) the underlying claim arises out of, or is related to, the defendants' forum-state activities, (2) the defendants' in-state contacts represent a purposeful availment of the privilege of conducting activities in the state, thereby making the defendant's involuntary presence before the state's courts foreseeable, and (3) the exercise of jurisdiction is reasonable, in light of certain Gestalt factors.[51]

Plaintiff alleges seven state law claims against each defendant, all of which pertain to the default of the annuity that Plaintiff purchased from CLICO at the suggestion of Naiem Qadir, Head of Investment Services at CNS in Grand Cayman. Specifically, Plaintiff contends that Defendants fraudulently induced him to purchase the annuity by misrepresenting the security of the investment. All of the Defendants' conduct, as alleged in the Complaint, took place in the Cayman Islands.

Nonetheless, Plaintiff asserts that sufficient minimum contacts between Defendants and Massachusetts are demonstrated by the following facts: (1) Defendants knew at the time of the transaction that Plaintiff was a Massachusetts domiciliary, even though he also resided in the Cayman Islands part of the year, (2) funds were transferred to Plaintiff's CNB and CNS accounts from his bank account in the United States, (3) Defendants' legal counsel sent a fax and a letter to Plaintiff in Massachusetts after the CLICO annuity defaulted, and (4) Defendants sent a marketing brochure about the CLICO annuity, as well as a spreadsheet of projected investment returns, to Plaintiff in an email, which he read from a computer in Massachusetts. Because this court finds that none of these contacts suffice to satisfy Plaintiff's claims to satisfy the minimum contacts

---

[51] Id. at 1089.

inquiry, this court is without jurisdiction over the Defendants.

To begin, the fact that Defendants knew the location of Plaintiff's domicile at the time that they dealt with him bears no relation to the allegedly fraudulent transaction, which took place entirely within the Cayman Islands. Similarly, the fact that the funds necessary to complete the transaction were *received from* the United States in no way constitutes an "important, or material element of proof in the plaintiff's case."[52] Indeed, where the money came from is utterly irrelevant to the underlying issue, i.e. whether or not Defendants fraudulently induced Plaintiff to purchase the CLICO security. And Plaintiff's claims certainly cannot be said to have arisen out of the fax and letter sent to Plaintiff by Defendants' counsel, since they were written in response to Plaintiff's threat of litigation and, therefore, came about only after the conduct underlying Plaintiff's claims was complete.

Thus, of the contacts that Plaintiff suggests may give rise to jurisdiction, only the email can plausibly be deemed even tangentially related to Plaintiff's underlying claims. Plaintiff asserts that Defendants emailed him a marketing brochure, prior to his purchase of the CLICO annuity, that was "intended to enhance the merits and advisability of the proposed investment"[53] by describing "the illustrious financial position of [CLICO], its growth and continued wealth, which Gargano's investment would be a part therof."[54] And Defendants do not dispute that they sent such an email. They do dispute, however, whether this email can suffice, without more, to satisfy the minimum contacts standard.

---

[52]Id. (quoting Marino v. Hyatt Corp., 793 F.2d 427, 430 (1st Cir. 1986)).

[53]Compl. ¶ 19.

[54]Compl. ¶ 20.

10

The "application of [the minimum contacts] rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."[55] "The focus of the purposeful availment inquiry is the defendant's intentionality."[56] This court cannot reasonably construe an email that could have been read from any computer anywhere in the world, but which the Plaintiff just happened to read in Massachusetts, as an intentional action by which Defendants availed themselves of the privileges of doing business in Massachusetts. Defendants did not direct their conduct toward Massachusetts. Rather, they sent an email to a stateless email account and Plaintiff, at his convenience, read that email from a computer located in Massachusetts.[57] Indeed, this is not purposeful availment, but precisely the kind of "random, isolated, or fortuitous"[58] contact with the forum state that the Supreme Court has said cannot constitute a basis for

---

[55]United Elec., 960 F.2d at 1088.

[56]Adams v. Adams, 601 F.3d 1, 6 (1st Cir. 2010).

[57]See Phillips, 530 F.3d at 28 n.3 (suggesting that perhaps the "voluntariness inquiry should be different for an e-mail contact than for a landline telephone, postal, or face-to-face contact. For the latter types of contacts, voluntariness is clear as the originator of the communication must know its destination before initiating the communication. For example, someone mailing a letter must write a physical address, which exists in some jurisdiction, on the envelope. With an e-mail, however, the originator sends a message to an e-mail address, which does not signal the physical location of the recipient. Generally, the recipient can open the e-mail anywhere in the world. In this case, voluntariness may be ambiguous because the originator of the communication may not know in which jurisdiction the communication will be received.").

[58]Fairview Mach. & Tool Co. V. Oakbrook Int'l, Inc., 56 F. Supp. 2d 134, 138 (D. Mass. 1999).

11

jurisdiction.[59]

In light of the foregoing, this court must conclude that to exercise jurisdiction over the Defendants in Massachusetts would violate the Due Process Clause of the Constitution. Accordingly, Plaintiff's state law claims must be dismissed.[60]

### C.   Personal Jurisdiction as to Plaintiff's Federal Claim

Plaintiff's Complaint additionally alleges one count against Defendants which arises under federal securities law.  Where subject matter jurisdiction over a claim is premised upon a federal statute that authorizes nationwide service of process, the court must apply a two-pronged analysis to determine whether it may properly exercise jurisdiction over the Defendants.[61]  First, the court asks whether the defendant had sufficient minimum contacts with the United States as a whole.[62] "Once minimum contacts have been established, [the court] assesses whether the exercise of personal jurisdiction is consistent with traditional notions of fair play and substantial justice."[63]

As noted above, in the context of a federal claim, the court looks to the Defendants' contacts with the entire United States, rather than merely with the forum state.  But, the substantive analysis of those contacts remains the same.  This court may only exercise jurisdiction

---

[59] Cf. Platten, 437 F.3d at 138 (citing Far W. Capital, Inc. v. Towne, 46 F.3d 1071, 1077 (10th Cir. 1995) ("It is well-established that phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts.")).

[60] It is worth noting that Plaintiff is not without a forum in which to seek relief.  Defendants concede that he may properly bring his claims in the Cayman Islands, if he so chooses.

[61] Filler v. Lernout, 337 F. Supp. 2d 298, 311 (D. Mass. 2004).

[62] Id.

[63] Id. (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 370 (3d Cir. 2002)).

over the Defendants if doing so comports with Due Process. And the constitutional touchstone remains whether Defendants have purposely availed themselves of the privileges of conducting business in the United States.[64] Importantly, nothing in the evidence before this court suggests any contacts between the Defendants and the United States other than the contacts between Defendants and Massachusetts, which are analyzed in the context of Plaintiff's state law claims above. And those contacts cannot plausibly be considered the purposeful availment of the privileges and protections of conducting business in the United States.

To begin with, this court cannot conclude that Defendants intentionally directed their conduct toward the United States, simply because they knew Plaintiff was domiciled in Massachusetts at the time of the transaction at issue. First Circuit precedent makes clear that "a defendant's awareness of the plaintiff's state of residence is not, by itself, enough to create personal jurisdiction."[65] Moreover, Plaintiff here has citizenship equivalent status, as well as a residence, in the Cayman Islands. He listed this Cayman Islands address on all of his accounts with Defendants. And the transaction at issue, the purchase of the CLICO annuity, took place entirely within the Cayman Islands. Most notably, all of the events that transpired between Plaintiff and Defendants were initiated by the Plaintiff. Defendants never solicited his business, in the United States or elsewhere.

Similarly, the fact that Defendants *received* money from Plaintiff's United States bank

---

[64] Id.; see also Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., 480 U.S. 102, 112 (1987).

[65] Adams, 601 F.3d at 7 (citing Phillips v. Prairie Eye Center, 530 F.3d 22, 28 (1st Cir. 2008).

13

account is not purposeful availment of an opportunity to act in the United States.[66] The receipt of a wire transfer is an inherently passive action.  For Defendants purposes, it did not matter where the money came from or how it got to them.  Plaintiff sought to purchase an annuity from CLICO, a Trinidadian insurance company, using Defendants as a broker.  In order to do so, he needed to provide Defendants with the money for the transaction.  And he happened to be holding those funds in a United States bank account at the time.  It would have been equally acceptable to Defendants, if Plaintiff had transferred the necessary funds by physically walking into the Cayman National Bank and handing a teller cash or a paper check.  Under such circumstances, no one could reasonably argue that Defendants had intentionally directed their conduct toward the United States, just because the money was at one time housed in a United States account. Cast in this light, it is clear that Defendants receipt of the funds by means of a wire transfer that originated in the United States is fortuitous contact between Defendants and the United States, which cannot constitute a basis for the exercise of personal jurisdiction.[67]

Accordingly, the only remaining contacts on which this court may potentially ground jurisdiction over Defendants are (1) the fax and letter sent to Plaintiff in Massachusetts by Defendants' legal counsel after the CLICO annuity defaulted and (2) at least one email relevant to the CLICO annuity that Plaintiff read from a computer in Massachusetts.  As to the fax and letter, "[i]t is well-established that [such communications] are not necessarily sufficient in themselves to

---

[66]See id. at 7 ("[T]he fact that Lee accepted funds from an individual who happened to be a Massachusetts resident...does not persuade us that he should have foreseen that he could be haled into court in Massachusetts.").

[67]See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (cautioning that jurisdiction may on rest on the "unilateral activity of another party or a third person").

establish minimum contacts."[68] This court is especially cognizant of the limited import that it may attribute to the fax and letter where, as here, the correspondence was sent only after the conduct alleged in the Complaint had taken place and Plaintiff had already threatened a lawsuit. It cannot be the case that a court may exercise jurisdiction over Defendants simply because their lawyer responded to Plaintiff's threats of legal recourse *after* the allegedly injurious transaction was complete.

Lastly, as this court explained in relation to Plaintiff's state law claims, the email that Plaintiff read from a computer located in Massachusetts cannot constitute purposeful availment sufficient to sustain the exercise of jurisdiction over Defendants. The fact that the computer from which Plaintiff read an email happened to be located in the United States demonstrates only the type of random and fortuitous contact between Defendants and the forum that cannot form the basis for the exercise of personal jurisdiction. Plaintiff could just as easily have accessed this email from his computer in the Cayman Islands. Plaintiff cannot now claim a jurisdictional benefit from the lucky circumstance that he was in the United States, rather than at his house in the Cayman Islands, on the day that this correspondence was received.[69]

IV.   Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss for Lack of Personal Jurisdiction [#8] is ALLOWED.

---

[68]Far W. Capital, 46 F.3d at 1077; see also Phillips, 530 F.3d at 29 ("It stretches too far to say that Prairie Eye, by mailing a contract with full terms to Massachusetts for signature and following up with three e-mails concerning the logistics of signing the contract, should have known that it was rendering itself liable to suit in Massachusetts.").

[69]See Phillips, 530 F.3d at 28 n.3.

AN ORDER HAS ISSUED.

                                                     /s/ Joseph L. Tauro  
                                             United States District Judge